UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALDRIDGE ELECTRIC, INC., ALDRIDGE ELECTRIC, INC. PROFIT SHARING PLAN, KENNETH ALDRIDGE, as Trustee of the Aldridge Electric, Inc. Profit Sharing Plan, and KEVIN BREEN, as Trustee of the Aldridge Electric, Inc. Profit Sharing Plan, | ) ) ) ) ) ) ) ) ) | Case No. 04 C 4021 |
| Plaintiffs, | ) ) | Judge Joan B. Gottschall |
| v. | ) ) | |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Aldridge Electric, Inc., Aldridge Electric, Inc. Profit Sharing Plan, Kenneth Aldridge, and Kevin Breen (collectively "Aldridge") filed suit against defendant Fidelity and Deposit Company of Maryland ("Fidelity"), alleging breach of contract under two alternative theories. Presently before the court are Aldridge's motion for summary judgment or, in the alternative, for summary judgment as to liability alone and Fidelity's cross-motion for summary judgment. For the reasons set forth below, Aldridge's alternative motions for summary judgment are denied and Fidelity's cross-motion for summary judgment is granted.

1

# I. BACKGROUND

The facts in this case are not in dispute. Aldridge Electric, Inc. ("Aldridge Electric") is an Illinois electrical contracting corporation that maintains an employee benefits plan, the Aldridge Electric, Inc. Profit Sharing Plan (the "Plan"). The Third Party Administrator of the plan at all times relevant to this case was Reed-Ramsey, Inc. ("Reed-Ramsey"). On February 3, 2005, Fidelity issued a Commercial Crime Coverage Policy, No. CCP 0000695B, (the "Policy") to Aldridge, insuring it for up to $500,000 against any occurrence of employee dishonesty. The Policy also specified a $2,500 dollar deductible for each occurrence of employee dishonesty.

More specifically, coverage under the Policy applied to money, securities, and property other than money and securities. "Employee dishonesty" is defined under the Policy as:

> [D]ishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with persons except you or a partner, with the manifest intent to:
> (1) Cause you to sustain loss; and also
> (2) Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:
>    a. the "employee"; or
>    b. Any person or organization intended by the "employee" to receive that benefit.

Pl.'s LR 56.1 St. of Material Facts, Ex. K. The policy also defines an "occurrence" of employee dishonesty as: "[A]ll loss caused by, or involving, one or more 'employees', whether the result of a single act or series of acts." *Id.*

Evelyn Lopez ("Lopez") was employed by Aldridge Electric as a payroll clerk and, from 1994 to 1998, as an executive assistant; a small portion of her time was spent

acting as the in-house administrator of the Plan. Pl.'s LR 56.1 St. of Material Facts ¶ 11. Lopez had broad responsibilities with respect to this latter duty, including communicating with Reed-Ramsey, intake of employee data, assisting employees with loans, distributing participant account statements, maintaining the Plan checking account (including the drafting of checks), and other administrative tasks. *Id.* at ¶ 12.

Between 1995 and 2003, Lopez wrongfully diverted monies, eventually totaling approximately three and a half million dollars, from the Plan to herself. *Id.* at ¶ 61. Lopez perpetrated this embezzlement scheme via two distinct methods. In one, she engineered a false loan application and promissory note from a Plan participant and drew up a check for the loan amount, either forging the signature on the check or wrongfully using a signature stamp to which she had access. *Id.* at ¶ 48. Lopez then directed the amount of the loan to herself, sometimes paying the loan back and sometimes allowing it to default. *Id.* Lopez then altered the Reed-Ramsey participant statements to reflect the amount that would have been in the participant's account had the "loan" not been taken out. *Id.* In the second scheme, Lopez falsely reported to Reed-Ramsey that a Plan participant had terminated, resulting in a withdrawal of that participant's money from the Plan which Lopez paid over to herself via a check drafted on the Plan's account with a forged signature or a signature stamp. *Id.* at 47.

It was this latter scheme that was to prove Lopez's eventual undoing. Lopez concocted a false termination withdrawal in the name of a Plan participant, Shelly Ventura ("Ventura"). Tom Lizzo ("Lizzo"), who was at the time a trustee of the Plan, knew that Ventura had not terminated her participation in the Plan, and questioned Lopez about Ventura's participant statement. *Id.* at 25-26. Lopez claimed that the statement

3

was a mistake on the part of Reed-Ramsey, and that she would address the matter: Lopez then left for lunch and did not return. *Id.* at 27-28. Later that night, Lopez made a tearful voicemail confession, promising to pay back the money. *Id.* at 29.

Realizing that the Plan faced potentially serious problems, Aldridge commissioned a comprehensive forensic fraud investigation and audit of the Plan, retaining the firm of Gleeson, Sklar, Sawyers & Cumpata ("Gleeson"). *Id.* at 32, 40. In the interim, Aldridge informed Fidelity that it had sustained a loss under the Policy in excess of $500,000. *Id.* at 35-36. Aldridge also informed the U.S. Department of Labor, which informed Aldridge that it was required to restore the loss, ensuring that each individual participant's loss was precisely determined, and directing that interest be paid at the rates specified by Internal Revenue Service Code § 6621. *Id.* at 35, 37-38.

By the end of Spring, 2003, Gleeson had completed its initial audit and issued a report (the "Kabler Report"), identifying a total of 77 Plan participants who had incurred losses as a result of Lopez's depredations. The report concluded that the losses totaled $3,101,736.49, with an additional $576,524.81 in interest, less $10,000 in restitution for a final total of $3,668,161.30. *Id.* at 56-57. Subsequently, the Kabler Report was amended at least twice to reflect that 83, rather than 77, Plan participants had been affected by Lopez's schemes, and that the resulting total was $2,959,693.19 plus $574,471.64 in interest, less $10,000 in restitution for a final total of $3,524,164.84. *Id.* at 60-63. Fidelity likewise engaged the services of Studler, Doyle & Company to conduct its own assessment of Aldridge's losses (the "Studler Report") which reached a final computation of a principal loss of $2,935,632.12. *Id.* at 64-65.

4

Plaintiff Aldridge subsequently filed suit against Fidelity, alleging two counts of breach of contract. On September 3, 2004, the parties entered into a partial settlement agreement whereby Fidelity paid Aldridge the $500,000 Policy limit of insurance for one occurrence of employee dishonesty, less $9,356.00 premiums owed. Aldridge filed an amended complaint on May 23, 2005. Count I of the complaint alleges that Lopez engaged in three separate schemes to steal from her employer, and that each scheme represents a separate "occurrence" under the Policy.[1] Under Count II of their amended complaint, Aldridge alternatively argues that Lopez's embezzlement of funds from the accounts of each of 83 Plan participants constitutes a separate "occurrence" under the terms of the Policy.[2] Both parties have filed motions for summary judgment, the argument of each turning on the definition of "occurrence" under the Policy. It is to these motions that the court now turns.

## II. ANALYSIS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing

---

[1] Plaintiffs claim that Lopez's third "scheme," (failure to make departing participants whole) is neither addressed nor relied upon in their motion for summary judgment. Pl.'s LR 56.1 Statement of Facts, ¶ 46 n.1. Consequently, the court need not consider it further.

[2] Although Aldridge's amended complaint alleges 77 individual occurrences of employee dishonesty, in their motion for summary judgment they have adjusted that number upward to 83 in light of the subsequent amendations to the Kabler Report.

party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Both parties concede that Illinois law controls in this case. Under Illinois law, interpretation of an insurance policy is a question of law. *Patrick Schaumburg Automobiles, Inc. v. Hanover Ins. Co.*, 452 F. Supp. 2d 857, 869 (N.D. Ill. 2006) (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)). The primary objective in interpreting an insurance policy is to ascertain the intent of the parties. *Outboard Marine*, 607 N.E.2d 1215; *Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 420 (7th Cir. 2005). The policy is construed as a whole, with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract. *Outboard Marine*, 607 N.E.2d at 1212. Accordingly, the Policy terms at issue in this case should be interpreted in light of the purpose of insurance covering employee dishonesty (often referred to as fidelity insurance). *Patrick*, 452 F. Supp. 2d at 869. The purpose of fidelity insurance is to protect against loss arising from an employee's lack of honesty or fidelity in carrying out his or her duties. *RBC Mortage. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 733 (Ill. App. Ct. 2004).

If the words of a policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *Outboard Marine*, 607 N.E.2d at 1212. If, however, the words are susceptible to more than one reasonable interpretation, they are

ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy. *Id.* This rule of construction in favor of coverage comes into play only when the term at issue is ambiguous. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005) (citing *Menke v. Country Mut. Ins. Co.*, 401 N.E.2d 539, 541 (Ill. 1980)). A contract is not ambiguous merely because the parties disagree on its meaning. *Central Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004) (citing *Johnstowne Centre P'ship v. Chin*, 458 N.E.2d 480, 481 (Ill. 1983)). However, a contract is not necessarily unambiguous when each party insists that the language unambiguously supports its position. *Central Illinois Light*, 821 N.E.2d at 214. Rather, whether a contract is ambiguous is a question of law. *Id.* (citing *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990)).

Aldridge argues that each of Lopez's two schemes (false loan applications and false terminations) constitutes a separate occurrence (Count I) or, alternatively, that each of the 83 fraudulent transactions by Lopez constitutes a separate occurrence (Count II). Fidelity argues that all of Lopez's embezzlements constitute a "single act or series of acts" and that consequently there was but one occurrence of employee dishonesty. Therefore, both motions for summary judgment turn on whether Lopez's acts constitute single or multiple "occurrences" as defined by the Policy.

Illinois courts follow the "four corners rule" of contract interpretation, which requires that the court initially look to the language of the contract alone, and not to extrinsic evidence, to determine if the contract is ambiguous. *Patrick*, 452 F. Supp. 2d at 870 (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (1999) ("An agreement, when reduced to writing, must be presumed to speak the intention of the

7

parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence"). Although Illinois law requires the court to determine the plain, ordinary, and popular meaning of contract terms, because interpretation is a question of law, the court may also look to the way in which other courts have interpreted the same term. *See Continental Cas. Co. v. Armstrong World Indus., Inc.*, 776 F. Supp. 1296, 1301 (N.D. Ill. 1991).

The Illinois Supreme Court has recognized that the word "occurrence," although initially appearing to signify a singular event, may be perceived as multiple events from the perspective of those who sustained injuries. *Nicor, Inc. v. Associated Elec. and Gas Ins. Services Ltd.*, 860 N.E.2d 280, 287 (Ill. 2006). Consequently, the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination as to whether a particular case involves one occurrence or many. Although Illinois has not yet defined precisely what is meant by "occurrence" in the context of acts of employee dishonesty in a fidelity insurance case, American courts have generally developed two basic approaches for assessing the number of occurrences that took place within the meaning of policies: the cause theory and the effect theory. *Id.* The effect theory determines the number of accidents or occurrences by looking at the effect an event had, *i.e.*, how many individual claims or injuries resulted from it. *Id.* (citing *Illinois Nat'l Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 92 (Ill. App. Ct. 1989). Under the cause theory, on the other hand, the number of occurrences is determined by referring to the cause or causes of the damages. *Nicor*, 860 N.E.2d at 287. The Illinois Supreme Court has held that the latter theory represents the law of Illinois. *Id.* at 288 (collecting

cases). Thus, multiple acts of illegal accounting expenditures have been held to constitute a single occurrence in the context of a Public Employees Bond. *Kinzer ex rel. City of Chicago v. Fidelity and Deposit Co. of Maryland*, 652 N.E.2d 20, 26 (Ill. App. Ct. 1995); *see also Roodhouse Nat'l Bank v. Fidelity & Deposit Co.*, 426 F.2d 1347, 1350 (7th Cir. 1970) (a series of forgeries occurring over a number of years constituted one loss to which the limit of liability of banker's blanket bond policy applied).

Since Illinois law has not yet defined "occurrence" in the context of employee dishonesty in a fidelity insurance case, the court looks for guidance to other jurisdictions that have done so employing the cause theory. In *Jefferson Parish Clerk of Court Health Insurance Trust Fund v. Fidelity and Deposit Co. of Maryland*, 95-951 (La. App. 5 Cir. 4/30/96); 673 So.2d 1238, a trustee of a health insurance trust fund withheld multiple employee contributions but failed to pay the premiums to the trust fund, using the withheld money to provide funds to operate his office and to pay non-insurance related expenses. 673 So.2d at 1245. The language of the trust fund's Commercial Crime Policy was identical to the Policy at issue in this case: "Occurrence means all loss caused by, or involving, one or more 'employees', whether the result of a single act or series of acts." *Jefferson Parish*, 673 So.2d at 1245.

The court found that the language was inclusive of any scheme to cause loss to the insured, and that therefore only one occurrence of employee dishonesty could be found under this definition. *Id.* The court further found that the trustee's multiple acts of embezzlement were integral parts of a scheme to deprive the trust fund of its current premiums which had a single direct aim: provide the trustee with additional funds to operate his office and pay non-insurance related expenditures, some of which were

9

questionable, if not illegal. *Id.* The court also observed that, under the cause theory, the number of claimants and/or participants in the Fund was irrelevant and immaterial to the scheme and that all of the trustee's acts were in furtherance of that scheme. *Id.* Therefore, according to the court, there was but one occurrence. *Id.*

Likewise, in *ECO Energy Co. v. Boden*, 64 F.3d 852 (3d Cir. 1995), the Third Circuit, applying Pennsylvania law (which also employs the cause theory), upheld the district court's holding that a series of thefts by a contractor was part of a larger scheme to steal that was the proximate cause of each theft. 64 F.3d at 856. According to the appellate court, "when a scheme to steal property is the proximate and continuing cause of a series or combination of thefts, the losses … constitute part of a single occurrence." *Id.* Cases from other jurisdictions employing the cause theory of occurrence have reached similar holdings. *See, e.g., EOTT Energy Corp. v. Storebrabd Int'l Ins. Co.*, 52 Cal. Rptr. 2d 894, 900 (a systematic and organized scheme to steal was the proximate cause of loss and was only a single occurrence); *Madison Materials Co., Inc. v. St. Paul Fire and Marine Ins. Co.*, No. 3:04-cv-14WS, 2006 WL 2792390, at *7 (S.D. Miss. Sept. 27, 2006) (employee's several acts of embezzlement constitute one occurrence); *Sherman & Hemstreet, Inc. v. Cincinnati Ins. Co.*, 594 S.E.2d 648, 651 (Ga. 2004) (series of embezzlements committed by a single employee over the course of several years fell within the policy's definition [identical to the Policy at issue] of a single "occurrence").

Aldridge relies principally upon two cases to support its contention that Lopez's acts constituted multiple occurrences. In support of Count II of its amended complaint, in which Aldridge claims 83 separate occurrences, Aldridge adduces *Nicor*, arguing that Lopez's unlawful acts against the 83 victimized Plan participants each constituted an

individual occurrence. In *Nicor*, mercury spills resulting from the bungled replacement of natural gas meters at various individual houses over a series of years were held to be individual occurrences. 860 N.E.2d at 294. According to the court, the spills constituted separate occurrences when the circumstances of each spill were unique and there was no common cause linking them: some spills were the result of accidents and others were caused by negligence, some were caused by Nicor employees and others by Nicor contractors, and no temporal or geographic pattern to the spills was established. *Id.* at 295. *Nicor* is thus distinguishable from the instant case, in which all of Lopez's acts were part of an overall scheme to divert funds fraudulently from the Plan to herself. Indeed, Aldridge's argument that *Nicor* supports the contention that Lopez's acts were individual occurrences because they injured individual Plan participants, despite the presence of a common cause (Lopez's scheme), is one effectively based in the effects theory rather than the cause theory. Such is not the law in Illinois, and Aldridge's argument accordingly fails.

Aldridge similarly relies upon *American Commerce Ins. Brokers, Inc. v. Minnesota Mutual Fire and Casualty*, 551 N.W.2d 224 (Minn. 1996), in support of its Count I argument that Lopez's two methods of embezzling funds (fraudulent loans and false terminations) constitute separate occurrences. In *American Commerce*, an employee embezzled funds via two separate methods: (1) pocketing cash payments or blank checks paid by customers as their premiums; and (2) issuing unauthorized payroll checks drawn on her employer to herself. 551 N.W.2d at 226. The court, in finding that these schemes constituted two occurrences, held that a court may consider several factors in concluding whether dishonest acts are part of a "series of related acts," including

11

whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi. *Id.* at 231. In so modifying the cause theory, the court rejected the Tenth Circuit's holding in *Business Interiors, Inc. v. Aetna Casualty and Sur. Co.*, 751 F.2d 361(10th Cir. 1984). In *Business Interiors*, the Tenth Circuit, employing the "cause theory", held that a "continuing course of dishonesty" by an employee constituted a single occurrence under the terms of a fidelity policy. 751 F.2d at 363. Aldridge, however, points to *American Commerce* in arguing that Lopez's scheme to fraudulently divert money from the Plan constituted two separate occurrences because it employed two distinct methods to achieve its end.

The court declines Aldridge's invitation to adopt the test specified in *American Commerce* for several reasons. First, the Illinois Supreme Court has explicitly held that the cause theory is Illinois law with respect to defining occurrences. *Nicor*, 860 N.E.2d at 288. Moreover, other courts, employing the cause theory, have held that an employee's scheme of embezzlement against an employer involving a fairly broad repertoire of tactics[3] constituted a single occurrence of employee dishonesty. *See Wausau Business Ins. Co. v. U.S. Motels Management, Inc.*, 341 F. Supp. 2d 1180, 1184 (D. Colo. 2004); *see also Glaser v. Hartford Cas. Ins. Co.*, 364 F. Supp. 2d 529, 537 (D. Md. 2005) (following *Wausau* in holding that employee who used a number of different fraudulent means to embezzle constituted a "series of [dishonest] acts" and was therefore a single occurrence).[4] Furthermore, no other court, in Illinois or elsewhere, has adopted

---

[3] Including manipulating the company's refund and fax/copy accounts, booking paid motel rooms as "comps," allowing two customers to live in the motel for a period of months for a fee which the employee kept for herself, and stealing daily cash deposits and ticket sales. *Wausau*, 341 F. Supp. 2d at 1182.
[4] The court notes in passing that, in Aldridge's civil suit against Lopez, Chief Judge Holderman found that Lopez had extorted money from Aldridge via "three separate schemes." However, whether those schemes collectively constituted a single occurrence for purposes of the Policy was not addressed by the court at that time. *Aldridge Elec. Inc. v. Lopez*, No. 1:03-cv-01372 (N.D. Ill. Aug. 19, 2003) (Docket No. 28).

12

the test prescribed in *American Commerce*, and at least one other has rejected it. *See TIG Ins. Co. v. Smart School*, 401 F. Supp. 2d 1334, 1346 (S.D. Fla. 2005) (declining to follow *American Commerce* to the extent that it attempts to further define the term "related" by providing a non-exhaustive list of factors to be considered in assessing whether acts are sufficiently connected to be considered "related"). Finally, the instant case is distinguishable from *American Commerce*. The dishonest employee in the latter case converted funds from both the various customers (who submitted cash or blank checks to her) as well as from the payroll account of her employer. *American Commerce*, 551 N.W.2d 226. In the instant case, Lopez's scheme had one primary aim: to divert money illegally from the Plan to herself. Although she employed two separate tactics to achieve this end, the court finds that they constitute a "series of related acts" as specified by the Policy, and therefore constitute a single occurrence.

Since the court holds as a matter of law that Lopez's acts constitute but a single occurrence of employee dishonesty, it denies Aldridge's motion for summary judgment. Fidelity's cross-motion for summary judgment is granted.

### III. CONCLUSION

For the reasons set forth above, Aldridge's alternative motions for summary judgment are denied. Fidelity's cross-motion for summary judgment is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 10, 2008

13